UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JONATHON R. MEAUX                                    CIVIL ACTION

VERSUS                                                         NO. 19-10628

COOPER CONSOLIDATED, LLC, *et al.*              SECTION M (5)

## FINDINGS OF FACT & CONCLUSIONS OF LAW

Plaintiff Jonathon R. Meaux brought a maritime personal injury claim against Savard Marine Services, Inc. d/b/a Savard Labor & Maritime Personnel, Inc. ("Savard"), his hiring employer, and Cooper Consolidated, LLC ("Cooper"), his borrowing employer.[1]  Meaux alleges he was injured on February 19, 2019, when he was hit in the head with a barge cover while working on board the *Bayou Special*, a vessel owned and operated by Cooper.[2]  Meaux brought claims under the Jones Act, 46 U.S.C. § 30104, and general maritime law for unseaworthiness and maintenance and cure.[3]  Cooper filed a crossclaim against Savard for defense and indemnity.[4]

In the course of this litigation, Meaux and Cooper filed cross-motions for summary judgment on seaman status.[5]  This Court granted Meaux's motion, and denied Cooper's cross-motion, finding that Meaux was a seaman under the test articulated by the Supreme Court in *Chandris v. Latsis*, 515 U.S. 347 (1995), because he spent all of his time working over water in the service of Cooper's fleet of crane barges.[6]  Cooper moved for reconsideration, arguing that Meaux did not meet the duration prong of the *Chandris* test because he was not physically aboard

---

[1] R. Docs. 1; 4.
[2] R. Docs. 1 at 2; 4 at 3.
[3] R. Docs. 1 at 3-7; 4 at 3-6.
[4] R. Doc. 49.
[5] R. Docs. 17; 28.  Savard joined in Cooper's opposition to Meaux's motion.  R. Doc. 31.
[6] R. Doc. 44.

one of Cooper's crane barges more than 30% of the time.[7]  The Court denied the motion finding that it did not matter that Meaux was not physically aboard Cooper's vessels when he was working in their service while exposed to the perils of the sea because the *Chandris* test does not have a physical-location requirement.[8]  In 2021, the Fifth Circuit handed down its en banc decision in *Sanchez v. Smart Fabricators of Texas, L.L.C.*, 997 F.3d 564 (5th Cir. 2021), adding three inquiries to the "perils of the sea" determination.  Following *Sanchez*, Cooper filed a renewed motion for reconsideration, this time arguing that Meaux did not meet the nature prong of the *Chandris* test when the *Sanchez* factors were considered.[9]  The Court denied Cooper's renewed motion for reconsideration, finding that, although it was a close call (especially with respect to whether Meaux's work was sea-based or involved seagoing activity), he satisfied the *Sanchez* test for establishing a connection to an identifiable fleet of vessels that was substantial in nature.[10]

Thereafter, Meaux settled his claims with Cooper and Savard.[11]  Cooper and Savard then entered into a memorandum of settlement to resolve Cooper's crossclaim wherein they agreed that if this Court determines after trial – including the presentation of evidence not considered in conjunction with the various summary-judgment motions – that Meaux is not a Jones Act seaman, Savard will fund more of the settlement with Meaux.[12]  On the other hand, if this Court finds that Meaux is a Jones Act seaman, Cooper will fund more of the settlement with Meaux.[13]

---

[7] R. Doc. 46.

[8] R. Doc. 57.

[9] R. Doc. 104.

[10] R. Doc. 120.

[11] R. Doc. 143.

[12] R. Doc. 158.

[13] *Id.*  Cooper submits a post-trial memorandum urging that the way it and Savard settled the crossclaim – making its resolution entirely dependent upon the Court's resolution of Meaux's seaman status – leaves the Court with a case or controversy to decide.  R. Doc. 155.  After careful consideration, that is likely so, even though Savard was originally aligned with Cooper, against Meaux, on the question of his seaman status.  *See* R. Doc. 31.  The settlement between Cooper and Savard does appear to leave each with a significant enough stake in the outcome to avoid characterization of the present state of the case as an arranged, friendly test of seaman status.

On February 9, 2022, this Court held a one-day bench trial on the limited issue of Meaux's seaman status.[14]  Having considered the evidence admitted at trial, the arguments of counsel, post-trial submissions, and the applicable law, the Court issues its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.  To the extent a finding of fact constitutes a conclusion of law, the Court adopts it as such, and vice versa.

## FINDINGS OF FACT

### I.  Jurisdiction

1.  This Court has jurisdiction over the claims in the complaint and crossclaim under the admiralty and maritime laws of the United States, 28 U.S.C. § 1333, and Rule 9(h) of the Federal Rules of Civil Procedure.[15]

2.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Cooper's crossclaim against Savard.[16]

3.  Venue is appropriate in the Eastern District of Louisiana.[17]

### II.  The Parties

4.  Cooper is a limited liability company organized under Louisiana law.  Cooper is the owner and operator of the *Bayou Special*, the crane barge on which Meaux was working at the time of the accident.[18]

5.  Savard is a corporation organized under Louisiana law with its principal place of business in Louisiana.  Savard was Meaux's hiring employer at the time of the accident.[19]

---

[14] R. Doc. 146.
[15] R. Docs. 1; 4; 49.
[16] R. Doc. 49.
[17] R. Docs. 1; 4.
[18] R. Doc. 144 at 2.
[19] *Id.* at 2, 17.

### III.   Cooper and Savard's Staffing Agreement

6.   Cooper and Savard entered into a staffing agreement on September 15, 2014, whereby

Savard agreed to provide workers to Cooper on a temporary and as-requested basis.[20]

7.   The staffing agreement was in effect on February 19, 2019, the date of Meaux's injury,

and governs the relationship between Savard and Cooper.[21]

8.   Clause 7 of the staffing agreement outlines the insurance obligations between Savard

and Cooper and provides in pertinent part as follows:

> **Insurance**:   Throughout the term of this Agreement and in any assignment of
> [Savard] personnel to [Cooper], [Savard] shall procure and maintain Statutory
> Worker's Compensation insurance for state of hire/operation (including coverage
> under the U.S. Longshore and Harbor Worker's Compensation Act where
> applicable), and Employer's Liability insurance in amounts of not less than One
> Million ($1,000,000) dollars, to cover all injuries, illness, disease or death of
> [Savard] employees who are in any way engaged in or connected with the
> performance of services hereunder.   [Savard] shall be solely responsible for
> payment of any deductible thereunder.   Said insurance is to include a waiver of
> subrogation and Alternate Employer endorsement in favor of [Cooper].   Liability
> for workers' compensation benefits, payments and/or awards to the employees shall
> rest solely upon [Savard] and its insurer(s), without any contribution from or by
> any coverage independently maintained by [Cooper].   [Savard] shall also procure
> and maintain Commercial General Liability insurance in an amount not less than
> $1,000,000 general aggregate limit per occurrence, which includes a Waiver of
> Subrogation in favor of [Cooper] and names [Cooper] and its subsidiaries as
> additional insured.[22]

9.   Clause 8 of the staffing agreement contains an indemnity provision, which reads as

follows:

> **Indemnity**:   [Savard] hereby agrees to fully and completely defend, indemnify and
> hold [Cooper] and its affiliates harmless from and against any claim for workers'
> compensation benefits of any kind or nature that may be asserted against [Cooper]
> or its affiliates by any [Savard] employee or representative thereof.   Moreover,
> [Savard] shall defend, indemnity and hold [Cooper] and its affiliates harmless from
> and against any failure of [Savard] to procure and maintain the insurance coverages
> specified by this Agreement and/or any other breach of this Agreement by [Savard],

---

[20] Trial Exh. 1 at 1.
[21] *Id.* at 1-3.
[22] *Id.* at 2.

including, without limitation, [Savard's] failure to comply with all requirements for its employment and assignment of its employees.[23]

10. The staffing agreement is clear and unambiguous. It requires Savard to provide defense, indemnity, or insurance coverage to Cooper for workers' compensation claims. Because the Court finds that Meaux was not a Jones Act seaman, as explained below, Savard owes defense, indemnity, or insurance coverage to Cooper under the clear and unambiguous terms of the staffing agreement.

## IV.   Meaux's Work at Cooper

11. Cooper's operations consist of loading and unloading large, oceangoing cargo vessels on the Mississippi River. To perform this work, Cooper uses floating derrick crane barges that are brought alongside the cargo vessels, which are moored to a buoy midstream in the Mississippi River. The buoys are located outside the river's navigation channel, so the loading and unloading operations can be conducted away from the vessel traffic. The location of the buoys from the riverbank varies depending on the water level, with some being as close as 150 feet from shore.[24]

12. Cooper performs this work at three separate locations on the Mississippi River: LaPlace, Belle Chasse, and Darrow.[25]

13. Cooper owns and operates a fleet of crane barges, including the *Bayou Special*, *Bob Crane*, *High Tide*, *Hulk*, *Irvin*, *Marilyn G*, and *Denise M.* Cooper's crane barges do not have motive power, but rather, are moved into location by a tugboat.[26]

14. The *Bayou Special* and the other crane barges for which Meaux worked are vessels that navigated and worked in the Mississippi River.[27]

---

[23] *Id.*
[24] R. Doc. 148 at 21, 50-51 (trial testimony of Robert Boswell, Cooper's director of stevedoring operations).
[25] *Id.* at 21.
[26] *Id.* at 21-22, 40.
[27] R. Doc. 144 at 17.

15. The function of the *Bayou Special* and the other crane barges for which Meaux worked was to operate at various locations in the Mississippi River, using her crane to load and unload ships and other barges.[28]

16. Cooper assigns certain workers, who are either full-time Cooper employees or operating engineer employees hired through a union hall, to work aboard each crane barge. A crane barge crew consists of a crane operator, oiler, and deckhand.[29]

17. Cooper assigns other workers, who are hired through staffing companies like Savard, to so-called "longshore crews,"[30] which consists of a "flag person" (or flagger), "utility person," and "equipment operator." These workers assist with Cooper's cargo operations. Their work is typically done aboard the larger, oceangoing cargo vessels that are being loaded and unloaded, but sometimes they work on the crane barge or barge alongside the crane barge, such as when performing barge cover-handling work.[31]

18. In December 2018, Savard hired Meaux to work at Cooper.[32]

19. On January 3, 2019, Meaux reported to Cooper's Belle Chasse office, where he underwent an all-day orientation.[33]

20. The next day, January 4, 2019, Meaux began his actual work.[34]

---

[28] *Id.*
[29] R. Doc. 148 at 22.
[30] This term was never used in this case until Boswell referenced it in his trial testimony, and then, once broached, he used the term repeatedly throughout his testimony, as if coached to do so. *Id.* at 22. When asked by the Court whether the term "longshore crew" is used in any Cooper personnel manual, Boswell reflexively said "to the best of my knowledge, it does refer to 'longshore,'" but then pulled back from his answer, stating that he was not sure. *Id.* at 44. Thus, the Court views Boswell's repeated use of the term with some skepticism. Nevertheless, as the caselaw teaches, it is function, not title, that matters, and there is no real dispute that much of Meaux's time was spent doing traditional longshore work.
[31] *Id.* at 22-24, 42-43, 66.
[32] R. Doc. 144 at 13.
[33] *Id.*
[34] *Id.*

21.  Meaux worked at all three Cooper locations (LaPlace, Belle Chasse, and Darrow) while employed by Savard and working for Cooper.[35]

22.  Meaux's job title at Cooper was flagger and utility man.[36]

23.  When working as a flagger, Meaux was positioned aboard the oceangoing vessels that were being unloaded to the cargo barges (that is, ship to barge) by Cooper's crane barges.  When working as a utility man, Meaux was positioned aboard the cargo-laden barges that were being loaded into the oceangoing vessels (that is, barge to ship) by Cooper's crane barges.[37]

24.  As a flagger, Meaux would assist the crane operator – who was operating the crane aboard one of the crane barges owned by Cooper – with his maneuvers to load or unload the cargo ship safely.[38]

25.  Specifically, a flagger is positioned aboard the larger, cargo vessel and is responsible for overseeing cargo operations in the vessel's hold by ensuring that the cargo is being moved properly to the center of the hatch for the crane to be able to pick it up.  The flagger also ensures that there is no damage to the ship or injury to equipment or personnel.  Once the crane's boom clears the cargo vessel's side, the flagger is no longer responsible for, or expected to give any signals or directions to, the crane barge operator because the operator is then able to rely on his own vision to direct the crane's movements.[39]

26.  Whereas Cooper's director of stevedoring operations, Robert Boswell, testified that Cooper does not permanently or temporarily assign a flagger to a specific crane barge or its fleet of crane barges because the flaggers that work for Cooper are "interchangeable,"[40] Cooper's

---

[35] *Id.*
[36] *Id.*
[37] *Id.*; Trial Exh. 2 (Meaux's deposition testimony) at 98-99.
[38] R. Doc. 144 at 13.
[39] R. Doc. 148 at 26-26, 44-45, 68-70.
[40] *Id.* at 26-27.

employment/assignment records show that during the period of Meaux's employment, he was most often assigned to work as a flagger or utility man in conjunction with the cargo operations of one of Cooper's crane barges.[41]  The location where a flagger (or longshore crew) works on any given day is determined by the specific task at hand, as well as the flagger's skill and ability, regardless of which crane barge was at that location.[42]

27. As a flagger and utility man Meaux was not assigned as a member of the crane barges' crews.[43]

28.  Cooper controlled, directed, and supervised Meaux's day-to-day work from his date of hire until March 13, 2019, his last day with Cooper.[44]

29.  Meaux performed no land-based work from his date of hire by Savard through March 13, 2019.[45]

30.  Meaux began and ended every day on land; he did not sleep aboard any of Cooper's vessels; and he brought his lunch to work with him every day.[46]

31.  Meaux worked at Cooper for 44 days before his February 19, 2019 accident.[47]

32.  According to Cooper's records, of the 44 days worked before his accident, Meaux worked at Cooper's LaPlace location for 30 days, at the Belle Chasse location for 13 days, and at the Darrow location for one day (the day of the accident).[48]

33.  Broken down, Meaux spent 68.18% of his time working at LaPlace, 29.55% of his time at Belle Chasse, and 2.27% of his time at Darrow.[49]

---

[41] Trial Exh. 4 at 7-35.
[42] R. Doc. 148 at 26-27.
[43] *Id.*
[44] R. Doc. 144 at 17.
[45] *Id.*
[46] R. Doc. 144 at 13; Trial Exh. 2 at 22, 35.
[47] R. Doc. 144 at 13.
[48] *Id.*
[49] *Id.* at 14.

34. Except for his one day at Darrow, Meaux performed his cargo-handling work midstream in the Mississippi River.  He rode a third-party owned and operated crew boat to the midstream locations.[50]

35.  On 13 days, Meaux worked at Cooper's Belle Chasse location.  On the first day, he attended an orientation.  The other 12 days, Meaux worked cargo operations.[51]

36.  While working at Cooper's Belle Chasse location, Meaux worked aboard four vessels: the *Baltic Wind*, *SBI Puma*, *Bayou Special*, and *High Tide*.  Cooper was the owner and operator of the crane barges *Bayou Special* and *High Tide*.[52]  Cooper did not own or operate the *Baltic Wind* or *SBI Puma*.  During this time, the *Bayou Special* and *High Tide* were unloading cargo from the *Baltic Wind* and *SBI Puma* to cargo barges.[53]

37.  Meaux performed maintenance work aboard Cooper vessels on five separate occasions while working at Cooper's Belle Chasse location: on January 4, 2019, Meaux spent the entire day performing maintenance aboard the *Bayou Special* or *High Tide*; on January 5, 2019, Meaux spent 3.25 hours performing maintenance aboard the *Bayou Special*; on January 8, 2019, Meaux spent 7.25 hours performing maintenance aboard the *High Tide*; and on January 14, 2019, and January 21, 2019, Meaux spent the entire day performing maintenance aboard the *Bayou Special*.[54]

38.  During these maintenance periods, the crane barges were tied up in a fleet at Belle Chasse.  Meaux was not assigned to a specific crane barge or as a member of its crew during that time.[55]

---

[50] R. Doc. 148 at 29-30.
[51] R. Doc. 144 at 14.
[52] *Id.*
[53] *Id.*
[54] *Id.* at 14-15.
[55] R. Doc. 148 at 34-35.

39. When working at Cooper's LaPlace location, Meaux did not perform any cargo operations while aboard the *Bayou Special*.[56]

40. On 15 of the 30 days that Meaux worked at Cooper's LaPlace location, he spent one hour performing maintenance work aboard the *Bayou Special* before going to the oceangoing vessels for loading operations.  On the other 15 days, he went directly from the *Bayou Special* to the oceangoing vessels without performing any maintenance work on a Cooper barge.[57]

41. While working at Cooper's LaPlace location (aside from the maintenance he performed), Meaux worked aboard seven different oceangoing vessels: the *Wen Zhu Hai*, *FJ Emerald*, *Leon*, *Ultra Leopard*, *Teal Bulker*, *Ocean Favour*, and *Faneromeni*.  Cooper does not own or control any of these vessels.[58]

42. On February 19, 2019, the date of the accident, Meaux was working at Cooper's Darrow location (for the first and only time) aboard the *Bayou Special* and the barges that were brought alongside it for cargo operations on the *Baltic Ace*, an oceangoing cargo ship owned and operated by a third party.  The port side of the *Baltic Ace* was tied up to the Zen-Noh dock.  Meaux was performing cover-handling work on the assisting barges.[59]

43. On the night of the accident, Meaux rode a crew boat from a dock to the *Bayou Special*. The crew boat caught up to the *Bayou Special* as it was being pushed downriver to the Zen-Noh dock, and Meaux rode on the *Bayou Special* as a passenger for the last half-mile or mile.  He did not perform any work on the *Bayou Special* or the tugboat during the short ride.[60]

---

[56] R. Doc. 144 at 14.
[57] *Id.*
[58] *Id.*
[59] R. Docs. 144 at 15; 148 at 37-42.
[60] Trial Exh. 2 at 35-36.

44.  This chart identifies the dates Meaux worked, the location, and the vessel upon which he was physically positioned:[61]

| Date Worked | Location | Meaux's Physical Position During Work |
|---|---|---|
| January 3, 2019 | Belle Chasse | None - Orientation |
| January 4, 2019 | Belle Chasse | *Bayou Special* and *High Tide* |
| January 5, 2019 | Belle Chasse | *Baltic Wind* and *Bayou Special* |
| January 6, 2019 | Belle Chasse | *Baltic Wind* |
| January 7, 2019 | Belle Chasse | *Baltic Wind* |
| January 8, 2019 | Belle Chasse | *SBI Puma* and *High Tide* |
| January 9, 2019 | Belle Chasse | *SBI Puma* |
| January 10, 2019 | Belle Chasse | *SBI Puma* |
| January 11, 2019 | Belle Chasse | *SBI Puma* |
| January 12, 2019 | Belle Chasse | *SBI Puma* |
| January 13, 2019 | Belle Chasse | *SBI Puma* |
| January 14, 2019 | Belle Chasse | *Bayou Special* |
| January 15, 2019 | LaPlace | *Wen Zhu Hai* |
| January 16, 2019 | LaPlace | *FJ Emerald* |
| January 17, 2019 | OFF | |
| January 18, 2019 | LaPlace | *Wen Zhu Hai* |
| January 19, 2019 | LaPlace | *Wen Zhu Hai* |
| January 20, 2019 | LaPlace | *Wen Zhu Hai* |
| January 21, 2019 | Belle Chasse | *Bayou Special* |
| January 22, 2019 | OFF | |
| January 23, 2019 | OFF | |
| January 24, 2019 | LaPlace | *Leon* |
| January 25, 2019 | LaPlace | *Leon* |
| January 26, 2019 | LaPlace | *Leon* |
| January 27, 2019 | LaPlace | *Leon* |
| January 28, 2019 | LaPlace | *Ultra Leopard* |
| January 29, 2019 | LaPlace | *Ultra Leopard* |
| January 30, 2019 | LaPlace | *Ultra Leopard* |
| January 31, 2019 | LaPlace | *Ultra Leopard* |
| February 1, 2019 | LaPlace | *Ultra Leopard* |
| February 2, 2019 | LaPlace | *Ultra Leopard* |
| February 3, 2019 | LaPlace | *Ultra Leopard* |
| February 4, 2019 | LaPlace | *Ultra Leopard* |
| February 5, 2019 | LaPlace | *Ultra Leopard* |
| February 6, 2019 | LaPlace | *Ultra Leopard* |
| February 7, 2019 | LaPlace | *Ultra Leopard* |
| February 8, 2019 | LaPlace | *Ultra Leopard* |
| February 9, 2019 | LaPlace | *Ultra Leopard* |

[61] R. Doc. 144 at 15-16.

| February 10, 2019 | LaPlace | *Teal Bulker* |
| February 11, 2019 | LaPlace | *Ocean Favour* |
| February 12, 2019 | LaPlace | *Ocean Favour* |
| February 13, 2019 | LaPlace | *Faneromeni* |
| February 14, 2019 | LaPlace | *Faneromeni* |
| February 15, 2019 | LaPlace | *Faneromeni* |
| February 16, 2019 | LaPlace | *Faneromeni* |
| February 17, 2019 | LaPlace | *Faneromeni* |
| February 18, 2019 | LaPlace | *Faneromeni* |
| February 19, 2019 | Darrow | *Bayou Special* and various barges alongside |

45. This chart outlines the work Meaux performed at Cooper's three locations:[62]

| Location | Total Days Worked at Location | Days Positioned on Larger Cargo Vessels | % of Total Time Worked | Days Worked Positioned on Cooper Vessels | % of Total Time Worked | Other Work | % of Total Time Worked |
|---|---|---|---|---|---|---|---|
| **LaPlace** | 30 | 28.75 | 65.34% | 1.25 | 2.84% | 0 | - |
| **Belle Chasse** | 13 | 8.12 | 18.45% | 3.88 | 8.82% | 1 | 2.27% |
| **Darrow** | 1 | 0 | - | 1 | 2.27% | 0 | - |
| **TOTAL** | 44 | 36.87 | 83.79% | 6.13 | 13.93% | 1 | 2.27% |

46. As shown in the above chart, Meaux spent 86.07% of his total time employed by Savard and working for Cooper either in orientation or positioned physically aboard the larger cargo vessels that were not owned or operated by Cooper when performing his assigned duties in assisting the Cooper crane barges in their loading and unloading operations. Meaux spent 13.93% of his total time employed by Savard and working for Cooper physically aboard vessels that were owned or operated by Cooper.[63]

---

[62] *Id.* at 16.
[63] *Id.* at 17.

## CONCLUSIONS OF LAW

**I.     The Jones Act – Seaman Status**

1.   Depending on the status of an injured worker and the allegedly responsible party, a maritime worker injured in the course and scope of his employment may bring an action under the Jones Act, the Longshore and Harbor Workers' Compensation Act ("LHWCA"), the general maritime law, or state law.  *See Chandris,* 515 U.S. at 355-56.

2.   The Jones Act permits a "seaman injured in the course of employment ... to bring a civil action at law, with the right of trial by jury, against the employer."  46 U.S.C. § 30104.  A Jones Act seaman may also bring a claim against his employer for maintenance and cure and unseaworthiness.  *See Becker v. Tidewater, Inc.,* 335 F.3d 376, 387 (5th Cir. 2003); *Meche v. Doucet,* 777 F.3d 237, 244 (5th Cir. 2015).  The LHWCA is a workers' compensation system and the exclusive remedy available to "a broad range of land-based maritime workers" who are injured in the course and scope of their employment but are not seaman and thus not entitled to sue under the Jones Act.  *Chandris,* 515 U.S. at 355 (citing 33 U.S.C. § 902(3)(G)).

3.   The term "seaman" is not defined in the Jones Act.  *See* 46 U.S.C. § 30104*.*  A plaintiff must establish seaman status.  *Becker,* 335 F.3d at 390 n.8.  Determining "whether an injured worker is a seaman under the Jones Act is a mixed question of law and fact."  *Id.* at 386.

4.   "Though the Jones Act does not define 'seaman,' Congress has elsewhere defined it as the 'master or member of any crew of any vessel.'"  *Naquin v. Elevating Boats, L.L.C.*, 744 F.3d 927, 932 (5th Cir. 2014) (citing *Chandris,* 515 U.S. at 355-56; 33 U.S.C. § 902(3)(G)), *overruled on other grounds by Sanchez*, 997 F.3d at 573.  However, not every "maritime worker on a ship at sea … is automatically a member of the crew of the vessel within the meaning of the statutory terms."  *Chandris,* 515 U.S. at 363.  Job title does not determine seaman status.  *Harbor Tug &*

13

*Barge Co. v. Papai*, 520 U.S. 548, 558 (1997). But seamen "owe their allegiance to a vessel and not solely to a land-based employer." *Chandris*, 515 U.S. at 359 (quotation omitted). The "inquiry is fundamentally status based: Land-based maritime workers do not become seamen because they happen to be working aboard a vessel when they are injured, and seamen do not lose Jones Act protection when the course of their service to a vessel takes them ashore." *Id.* at 361. Moreover, "[i]n evaluating the employment-related connection of a maritime worker to a vessel in navigation, courts should not employ a 'snapshot' test for seaman status, inspecting only the situation as it exists at the instant of injury; a more enduring relationship is contemplated in the jurisprudence." *Id.* at 363 (quotation and citation omitted). "Thus, a worker may not oscillate back and forth between Jones Act coverage and other remedies depending on the activity in which the worker was engaged while injured." *Id.*

5. In *Chandris*, the Supreme Court established a two-part test for seaman status. First, the employee's duties must "contribute to the function of the vessel or to the accomplishment of its mission." *Id.* at 368. Satisfying this part of the seaman test is relatively easy because the individual "need only show that he does the ship's work." *Naquin*, 744 F.3d at 933 (quoting *Becker*, 335 F.3d at 387-88). "This threshold requirement is 'very broad,' encompassing 'all who work at sea in the service of a ship.'" *Becker*, 335 F.3d at 387-88 (quoting *Chandris*, 515 U.S. at 368).

6. Second, the employee "must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its *duration* and its *nature*." *Chandris*, 515 U.S. at 368 (emphasis added). The claimed connection to a vessel or fleet of vessels must be "temporally, more than fleeting, and, substantively, more than incidental," because

> the fundamental purpose of the substantial connection requirement is "to separate
> the sea-based maritime employees who are entitled to Jones Act protection from

14

> those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea."

*Naquin*, 744 F.3d at 933 (quoting *Chandris*, 515 U.S. at 368).

7.   "The duration of a worker's connection to a vessel and the nature of the worker's activities, taken together, determine whether a maritime employee is a seaman because the ultimate inquiry is whether the worker in question is a member of the vessel's crew or simply a land-based employee who happens to be working on the vessel at a given time."  *Chandris,* 515 U.S. at 370.

8.   In determining the durational aspect of the vessel-connection requirement, the Supreme Court has adopted the Fifth Circuit's general rule of thumb that "[a] worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act."  *Id.* at 371.  The Supreme Court explained that this figure:

> serves as no more than a guideline established by years of experience, and departure from it will certainly be justified in appropriate cases.  As we have said, the inquiry into seaman status is of necessity fact specific; it will depend on the nature of the vessel and the employee's precise relation to it.

*Id.* (quotation and citation omitted).

9.   In determining whether an employee has a substantial connection to a vessel in navigation in terms of its nature, again, "it is not the employee's particular job that is determinative of seaman status, but the employee's connection to the vessel."  *In re Endeavor Marine, Inc.*, 234 F.3d 287, 291 (5th Cir. 2000) (quoting *Chandris*, 515 U.S. at 364), *abrogated by Sanchez*, 997 F.3d at 573.  Until *Sanchez*, an employee would qualify for seaman status if the employee's connection to a vessel "regularly exposes him to the perils of the sea."  *Id.* (explaining *Harbor Tug*, 520 U.S. at 554-55)  Further, an employee would still be deemed exposed to the perils of the sea despite limited experience in the open water; therefore, workers involved in a vessel's work near shore "still remain exposed to the perils of a maritime work environment."  *Naquin*, 744 F.3d

at 934 (rejecting "the categorical assertion that workers who spend their time aboard vessels near the shore do not face maritime perils").

## II.   Meaux's Seaman Status After *Sanchez*

10.  In *Sanchez*, the Fifth Circuit, sitting en banc, expressly overruled the panel decision in *Naquin v. Elevating Boats, L.L.C.*, 744 F.3d 927, 932 (5th Cir. 2014), and called into question the panel decision in *In re Endeavor Marine, Inc.*, 234 F.3d 287, 291 (5th Cir. 2000), to the extent they held that the nature prong of the *Chandris* test was satisfied if the plaintiff was exposed to the "perils of the sea," without requiring more.  *Sanchez*, 997 F.3d at 573.  In the wake of *Sanchez*, courts examining the nature of a putative Jones Act seaman's connection to a vessel must make the following "additional inquiries," that is, in addition to asking whether a worker was subject to the perils of the sea, courts must ask:

> (1) Does the worker owe his allegiance to the vessel rather than simply to a shoreside employer?
>
> (2) Is the work sea-based or involve seagoing activity?
>
> (3) (a) Is the worker's assignment to a vessel limited to performance of a discrete task after which the worker's connection to the vessel ends, or (b) Does the worker's assignment include sailing with the vessel from port to port or location to location?

*Id.* at 574.

11. After *Sanchez* was handed down, Cooper filed a renewed motion for reconsideration of this Court's prior ruling on the nature prong of the seaman-status test.[64]  In answering the first of the three *Sanchez* inquiries, the Court determined that Meaux owed his allegiance to Cooper's fleet of crane barges "because all his work was done in the service of those vessels as a member of their crews assisting in their cargo-handling mission," and that "even if Cooper might be

---

[64] R. Doc. 104.

16

considered a shoreside employer as to other of its employees, it was not as to Meaux" since the work he performed was done midstream in conjunction with Cooper's vessels.[65]

12. In answering the second of the *Sanchez* inquiries (namely, whether Meaux was engaged in sea-based or seagoing activity), the Court acknowledged that it was making a close call: while Meaux performed traditional longshore work, which is typically considered land-based employment, he did so on vessels moored or anchored midstream in the Mississippi River, more than a gangplank from shore, rendering his work for Cooper's crane barges sea-based.[66]

13. In answering the third *Sanchez* inquiry, the Court determined that Meaux did not simply perform discrete tasks for the Cooper crane barges he was assigned to work with, but instead, he worked full-time with the crane barges to assist them in loading or unloading cargo vessels midstream in the river.[67]

14. Finally, in addition to resolving the *Sanchez* factors in favor of the nature prong of the seaman-status test, the Court continued to hold that Meaux's work subjected him to the perils of the sea – which is still a consideration after *Sanchez*, albeit only along with the three inquiries.[68]

15. Thus, in denying Cooper's renewed motion for reconsideration, the Court concluded that Meaux satisfied the *Sanchez* test for establishing a connection to an identifiable fleet of vessels that is substantial in nature and reaffirmed that Meaux was a Jones Act seaman.  But the Court did so while acknowledging the perplexing dilemma "that Meaux's traditional longshore work, if done from the same crane barges tied up to the same cargo vessels dockside of the Mississippi River, would land him outside the scope of Jones Act seaman status."[69]

---

[65] R. Doc. 120 at 6.
[66] *Id.* at 6-7.
[67] *Id.* at 7.
[68] *Id.*
[69] *Id.*  In ruling on Cooper's renewed motion for reconsideration, the Court did not revisit its rulings on the **duration prong**.  *See* R. Docs. 44; 57.  Nor does it now.  This Court has found that though Meaux was not physically located aboard a Cooper vessel when performing his assigned duties (a requirement Cooper insists the Court errs in

### III.     Meaux's Seaman Status Reconsidered After Trial

16. Now, after trial of the seaman-status issue, and having reconsidered all the previously submitted evidence, along with the previously unavailable testimony presented at trial,[70] the Court reverses its prior rulings and holds that Meaux was not a Jones Act seaman because the evidence presented at trial establishes that the balance of the *Sanchez* factors weighs against seaman status.

17. First, the Court looks anew at the question whether Meaux owed his allegiance to Cooper's fleet of crane barges as opposed to a shoreside employer.  Cooper repeats its arguments that Meaux did all his work for Savard and Cooper as shoreside employers and that he did not work solely with a single crane barge to which he owed allegiance.[71]  Characterizing Cooper as a

---

not imposing), the entirety of these duties was performed by him in the service of a Cooper vessel in navigation, that is, one within Cooper's fleet of crane barges under its common ownership or control.  In this way, the duration prong is satisfied.  Nevertheless, in an abundance of caution, the Court's prior rulings addressing the duration prong (R. Docs. 44; 57) are incorporated herein as findings of fact and conclusions of law, but because the Court holds that the ***nature prong*** of the seaman-status test fails, they are unnecessary to the Court's present decision.

[70] Cooper and Savard settled the crossclaim with the express understanding that the Court undertake a bench trial to revisit its prior ruling on seaman status.  The trial would permit a more developed evidentiary record.  In essence, then, the trial essentially called for reconsideration of this Court's prior summary-judgment orders.  Reconsideration of interlocutory orders is governed by Rule 54(b) of the Federal Rules of Civil Procedure, which provides in pertinent part:

> [A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Under Rule 54(b), a district court "is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law."  *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 336 (5th Cir. 2017).  Unlike motions to alter or amend a judgment under Rule 59(e), "Rule 54(b)'s approach to the interlocutory presentation of new arguments as the case evolves can be more flexible, reflecting 'the inherent power of the rendering district court to afford such relief from interlocutory judgments as justice requires.'"  *Id.* at 337 (quoting *Cobell v. Jewell*, 802 F.3d 12, 25-26 (D.C. Cir. 2015)).  However, the district court must exercise this broad discretion sparingly to forestall the perpetual reexamination of orders and the resulting burdens and delays.  *See Calpecto 1981 v. Marshall Expl., Inc.*, 989 F.2d 1408, 1414-15 (5th Cir. 1993) ("if the district court was required to reconsider [an interlocutory order] simply because [the losing party] belatedly came forward with evidence not submitted prior to the ruling[,] … the cycle of reconsideration would be never-ending"); *Domain Protection, LLC v. Sea Wasp, LLC*, 2019 WL 3933614, at *5 (E.D. Tex. Aug. 20, 2019) ("although a district court *may* revisit an interlocutory order on any ground it sees fit, it may also use its discretion to prevent parties from, without justification, raising new arguments for the first time") (emphasis in original; alteration and quotation omitted); 18B CHARLES A. WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4478.1 (3d ed. 2019).

[71] R. Doc. 154 at 11-12.

shoreside employer for all purposes is exaggerated.  Thus, although Meaux was not permanently assigned to the crew of any one crane barge, he was most often assigned to assist in the cargo-handling mission of one or another of the crane barges within Cooper's fleet.  In this sense, he was employed by Savard to work for Cooper performing cargo-handling operations and his daily assignments, including the Cooper vessel with which he worked, were dictated by the work required.  If Meaux's work as part of a longshore crew makes Cooper a shoreside employer, even though his work was performed midstream in conjunction with Cooper's vessels, this first of the *Sanchez* inquiries is reduced to a circular test.  Still, the function Meaux performed (longshoring) is an important consideration.  Cooper also (but somewhat inconsistently) argues that the longshore crew's loyalty is to the cargo vessels being loaded and unloaded, not to Cooper's crane barge, because the cargo vessels "have the ability to tell the crane operators and/or longshore crew to perform the work in certain ways."[72]  This argument is unavailing as it proves too much and too little.  After all, this would suggest that the allegiance of the crane barge crew likewise runs to the cargo vessels since the crane barge crew, too, is subject to such direction.  But allegiance is different from a line of communication, even an authoritative workflow line of communication.  In addition, Cooper's argument fails to explain why the longshore crew's loyalty would run to the cargo vessels (which are owned by various entities not including Cooper) when the longshore crewmembers are recruited, hired, paid, assigned work, and supervised by Cooper.  Viewing these factors together, though, this first *Sanchez* inquiry may tilt ever so slightly in favor of seaman status.

18. Second, the Court again examines whether Meaux was engaged in sea-based or seagoing activity.  This remains a close call.  Cooper is correct that Meaux performed traditional

---

[72] R. Doc. 153 at 2.

longshore work, which is typically considered land-based employment.  What is different here is that Meaux performed his work on vessels stationed midstream in the Mississippi River.  Only once, at Darrow on the date of his injury, was the oceangoing cargo vessel moored dockside, just a gangplank from shore.  In its previous ruling, the Court analyzed this difference to find that it subjected Meaux to the perils of the sea such that, on balance, his work should be considered sea-based.  Following *Sanchez*'s rejection of "perils of the sea" as a determinative consideration, however, the Court now reassesses its previous ruling.  While Meaux's work was done on vessels midstream, is it proper to say that his duties really took him to sea?  *See Papai,* 520 U.S. at 555 ("For the substantial connection requirement to serve its purpose, the inquiry into the nature of the employee's connection to the vessel must concentrate on whether the employee's duties take him to sea.").  Boarding a crew boat to get to work is not seagoing activity; nor is performing longshore work near or around water.  Otherwise, scores of maritime workers would be transformed into Jones Act seaman who the law currently does not recognize as such.  As this Court previously observed, Meaux would certainly not be categorized as a seaman if the vessel being loaded and on which he worked was dockside.[73]  Simply put, it cannot be said that Meaux's duties took him to sea in the way *Sanchez* envisions to allow his work to be considered sea-based or its nature seagoing activity.

19.  Third, the Court reexamines whether Meaux's assignment to any vessel was limited to the performance of a discrete task after which his connection to the vessel ended, or whether his assignment included sailing with the vessel from port to port or location to location.  In his work for Cooper, Meaux was assigned the jobs of flagger or utility man, each of which assisted the crane barges to complete their cargo-handling missions; these were not discrete tasks, like that of a

---

[73] R. Doc. 120 at 6-7.

contract welder who goes from ship-to-ship performing distinct welding jobs for different vessels, with no connection to them.  This aspect of the third *Sanchez* inquiry, then, tips in favor of seaman status.  But the other question bound up in this inquiry – that is, whether Meaux's assignment included sailing with the crane barges from port to port or location to location – tips decidedly against seaman status.  The evidence shows that Meaux did not sail with any of Cooper's crane barges from cargo-handling location to cargo-handling location in the Mississippi River.  There is no evidence that Meaux did any work on any Cooper crane barge while it was in transit.  Only once did Meaux ride a crane barge (the *Bayou Special*) to its work destination, and then only as a passenger, and only because his crew boat caught up to it.  On all the other days, Meaux boarded a crew boat or walked a gangplank to board the crane barge with which he was assigned to work that day and then, most often, only to cross over the deck of the crane barge to board the cargo vessel to perform his signaling duties as flagger.  Then, at the end of the day, he would take the crew boat to shore and he would go home like any other longshoreman.  Thus, on balance, this factor weighs against seaman status.

20.  In sum, when all the evidence addressing the *Sanchez* factors is considered and weighed together, the Court determines, on another close call, that Meaux was not a Jones Act seaman.

Accordingly, for the foregoing reasons,

IT IS ORDERED that there be judgment in favor of Cooper and against Savard finding that Meaux was not a Jones Act seaman.

New Orleans, Louisiana, this 3rd day of May, 2022.

BARRY W. ASHE
UNITED STATES DISTRICT JUDGE